# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

**Civil Action No.** _____

DAVID "RYAN" McCAIGUE, an individual,

    Plaintiff,

v.

DOENCH WEALTH MANAGEMENT, LLC;
and BRIAN H. DOENCH, an individual,

    Defendants.

_____/

## COMPLAINT FOR DAMAGES

Plaintiff DAVID "RYAN" McCAIGUE, an individual ("Plaintiff" or "McCaigue"); by and through undersigned counsel, files this Complaint for Damages against Defendants DOENCH WEALTH MANAGEMENT, LLC ("DWM"); and BRIAN H. DOENCH ("Defendant" or "Doench") (together DWM and Doench are "Defendants"), and states as follows:

## PRELIMINARY STATEMENT

1. In November 2014, Plaintiff hired Defendant as an investment adviser to manage Plaintiff's Individual Retirement Account ("IRA").

2. Between November 2014 and May 2018, Plaintiff contributed a total of $345,511.55 in principal to his IRA.

3. Notwithstanding the trust placed with him by Plaintiff, Defendant breached the fiduciary duties he owed to Plaintiff and negligently mismanaged the IRA.

4. As of April 2020, Plaintiff's IRA balance had dwindled to $147,194.70.

5. Consequently, Plaintiff seeks entry of a final judgment awarding Plaintiff damages, together with interest, costs, and attorneys' fees.

## GENERAL ALLEGATIONS

### THE PARTIES

6. Plaintiff DAVID "RYAN" MCCAIGUE ("Plaintiff" or "McCaigue") is an individual domiciled in Broward County, Florida, is a citizen of Florida, and is *sui juris*.

7. Defendant DOENCH WEALTH MANAGEMENT, LLC ("DWM") maintains an office in, and conducts business from, 1712 Mattox Court, Charlottesville, Virginia 22903. DWM was founded, owned, operated, and is controlled by Defendant Doench.

8. Defendant BRIAN H. DOENCH ("Doench" or "Defendant") is an individual domiciled in Charlottesville, Virginia, is a citizen of Virginia, and is *sui juris*.

9. Upon information and belief, DWM is wholly owned, operated, and entirely dominated by Doench, who operates the businesses as its Manager while ignoring all corporate formalities and using the company as a mere instrumentality for his personal interests in an attempt to shield himself from personal liability for his wrongful conduct. The company does not exist separate or apart from Doench and merely served as a pass-through entity from which Doench takes all profits.

### JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs and is between citizens of different States.

11. This Court has personal jurisdiction over Defendants because at all times material hereto: (a) Defendants conducted business within this District in Broward County, Florida; and (b) all of Defendants' conduct, actions, and inactions that gave rise to the claims in this lawsuit occurred within this District.

12. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendants reside, or at all times material hereto, resided in this judicial district; and the events and omissions giving rise to the claims herein occurred within this judicial district.

## GENERAL ALLEGATIONS

13. Plaintiff and Defendant met when they rented neighboring condominium units in a Miami-Dade, Florida residential community in 2012. They developed an amicable relationship, including exchanging cell phone numbers and texting one another for neighborly favors.

14. In January 2014, Plaintiff moved to Hollywood, Florida.

15. Defendant and Plaintiff discussed Plaintiff's finances in 2014; and at that time, Defendant offered Plaintiff his professional investment advisory services.

16. Defendant, who is an investment advisor providing his professional services through DWM (the entity he founded), represented to Plaintiff that he (*i.e.*, Defendant) is registered with the Securities and Exchange Commission ("SEC") as an investment advisor.

17. Defendants provided Plaintiff a brochure about DWM that included the following representations and statements:

   (a) "As a registered investment adviser, we are held to the highest standard of client care – a fiduciary standard. As a fiduciary, we always put our client's interests first and must fully disclose any potential conflict of interest."

   (b) "DWM offers ongoing portfolio management services based on the individual goals, objectives, time horizon, and risk tolerance of each client. DWM creates an Investment Policy Statement for each client, which outlines the client's current situation (income, tax levels, and risk tolerance levels) and then constructs a plan to aid in the selection of a portfolio that matches each client's specific situation."

   (c) "DWM evaluates the current investments of each client with respect to their risk tolerance levels and time horizon. DWM will request discretionary authority from clients in order to select securities and execute transactions without permission from the client prior to each transaction. Risk tolerance levels are documented in the Investment Policy Statement, which is given to each client."

(d) "DWM seeks to provide that investment decisions are made in accordance with the fiduciary duties owed to its accounts and without consideration of DWM's economic, investment or other financial interests. To meet its fiduciary obligations, DWM attempts to avoid, among other things, investment or trading practices that systematically advantage or disadvantage certain client portfolios, and accordingly, DWM's policy is to seek fair and equitable allocation of investment opportunities/transactions among its clients to avoid favoring one client over another over time. It is DWM's policy to allocate investment opportunities and transactions it identifies as being appropriate and prudent among its clients on a fair and equitable basis over time."

(e) "DWM will tailor a program for each individual client. Beyond a risk tolerance appraisal, DWM considers the client's investment time horizon along with near- and longer-term liquidity needs and the tax implications of various investment transactions."

(f) "All client portfolio management accounts are reviewed at least quarterly by Brian H Doench with regard to clients' respective investment policies and risk tolerance levels. All accounts at DWM are assigned to this reviewer."

(g) Plaintiff could obtain additional information about DWM on the SEC's website at www.adviserinfo.sec.gov.  DWM's CRD number is: 171515.

*See* Exhibit 1 (Doench Wealth Management, LLC Firm Brochure – Form ADV Part 2A).

18.   Defendant also provided Plaintiff a brochure about Defendants that included the following representations and statements:

(a) Brian Harold Doench, Personal CRD Number: 5362280, Investment Adviser Representative;

(b) "There are no legal or disciplinary events that are material to a client's or prospective client's evaluation of this advisory business."

(c) "Brian Harold Doench is a licensed insurance agent. From time to time, he will offer clients advice or products from those activities. Clients should be aware that these services pay a commission and involve a conflict of interest, as commissionable products conflict with the fiduciary duties of a registered investment adviser. Doench Wealth Management, LLC always acts in the best interest of the client; including the sale of commissionable products to advisory clients. Clients are in no way required to utilize the services of any representative of Doench Wealth Management, LLC in such individual's outside capacities."

(d) "As the only owner and representative of Doench Wealth Management, LLC, Brian Harold Doench supervises all activities of the firm. Brian Harold Doench's response information is on the cover page of this disclosure

   document. Brian Harold Doench adheres to all required regulations regarding the activities of an Investment Adviser Representative and follows all policies and procedures outlined in the firm's policies and procedures manual, including the Code of Ethics, and appropriate securities regulatory requirements."

*See* <u>Exhibit 2</u> (Doench Wealth Management, LLC Firm Brochure Form ADV Part 2B – Individual Disclosure Brochure).

  19. Based on their prior relationship and Defendant's representations regarding his experience and skill in managing investments, Plaintiff agreed to hire Defendant as his investment adviser with respect to his IRA.

  20. Plaintiff and Defendant held several conferences to discuss Plaintiff's investment strategies, goals, and objectives.

  21. During their conferences, Plaintiff advised Defendant that his IRA was his retirement nest egg and that he wanted to be conservatively invested, preserving his principal while achieving modest growth.

  22. Defendant told Plaintiff that he would create a personalized portfolio for Plaintiff that would preserve his principal, avoid subjecting his principal to volatility, and focus on obtaining modest, compounded growth.

  23. For example, in July 2014, Defendant texted Plaintiff: "Don't worry, we won't ever do 50/50! Gotta preserve your $$ as much as make more lol."

  24. Defendant assured Plaintiff that his management would be personalized, not "cookie cutter," and would be designed for Plaintiff's specific investment goals and objectives.

  25. After several discussions between Plaintiff and Defendant about Plaintiff's investment needs and goals -- and in reasonable reliance upon the factual representations made to him by Defendant – Plaintiff transferred custody and control of his IRA to Defendant's care in November 2014.

  26. In November 2014, Plaintiff granted Defendant access, control, and discretion to Plaintiff's IRA. At that time, Plaintiff's IRA consisted of approximately $223,246.68 in cash.

27. Thereafter, in May 2018, Plaintiff combined a separate retirement account into his IRA, adding another $121,861.81 in principal to his IRA.

28. Throughout the relevant time, Defendant had access, control, and discretion over $345,155.55 in principal funds from Plaintiff.

29. In November 2016, Plaintiff texted Defendant that Defendant had not charged Plaintiff for his investment advisory services in quite some time; and Plaintiff asked Defendant to send him a bill.

30. Defendant replied: "Hahaha, thanks man. We'll see. I promised myself and you not to charge until we broke even—and I'm super embarrassed your holdings haven't performed better over the past couple of years. No worries my friend, happy to help in any way I can!"

> Bman Doench (+█████████)
>
> Hahaha, thanks man. We'll see. I promised myself and you not to charge until we broke even—and I'm super embarrassed your holdings haven't performed better over the past couple of years. No worries my friend, happy to help in any way I can!

31. In February 2018, Plaintiff told Defendant that he "really like[s]" an investment in PetIQ, Inc., which is a company that manufactures pet medications and provides pet wellness services.

32. Between July 31, 2018 and August 2, 2018, at Plaintiff's direction, Defendant invested over $125,000.00 of Plaintiff's IRA funds in PetIQ stock, which represented more than one-third of Plaintiff's holdings.

33. Ultimately, Plaintiff's suggestion to purchase PetIQ turned out to be one of the few purchases that resulted in positive returns in Plaintiff's IRA. Most of the purchases made by or suggested by Defendant resulted in losses.

34. On April 24, 2018, Defendant texted Plaintiff: "I honestly don't feel like I've helped you that much, which I'm rather embarrassed about lol!"

35. Emblematic of the disservice Defendant rendered to Plaintiff, Defendant -- without seeking approval from Plaintiff -- invested large amounts of Plaintiff's IRA in questionable and risky penny and weed stocks, like Aurora Cannabis (ACB), Ambler (AMBL), eWell Healthcare Corporation (EWLL), and KinerjaPay Corp. (KPAY); and those investments all worked to Plaintiff's detriment.

## SUMMARY OF TRANSACTIONS

36. Defendant actively traded Plaintiff's IRA on a near-daily basis, often executing large volumes of trades that were exorbitant and contrary to industry standards, particularly for an individual retirement account. For example, Defendant invested Plaintiff's IRA funds in penny stocks, which he would then trade tens of times in the course of several months.

37. Defendant implemented and executed unsustainable and unsuitable trading strategies for Plaintiff's IRA account, which required conservative, non-interventionist strategies with sparse amounts of trading and investment in blue-chip companies, like Facebook, Amazon, Apple, Netflix and Google.

38. Due to Defendant's speculative intra-day trading style, Plaintiff suffered hundreds of thousands of dollars of losses in a market that was otherwise rising.

39. A summary of trades executed by Defendant in Plaintiff's IRA that resulted in a profit or loss of at least $10,000.00 include the following:

  (a) Stock:      Aphria Inc.
     Stock Price:[1]    $3.44
     No. of Trades:   12
     Dates of Trades:  May 24, 2018 – December 6, 2018
     Profit/(Loss) Total:  ($15,427.58)

  (b) Stock:      Aurora Cannabis Inc.
     Stock Price:     $0.67
     No. of Trades:   14
     Dates of Trades:  May 24, 2018 – March 19, 2019
     Profit/(Loss) Total:  ($20,708.94)

---

[1] Stock price is as of or around May 8, 2020.

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

    (c)  Stock: Canopy Growth Corp.
          Stock Price: $15.34
          No. of Trades: 14
          Dates of Trades: June 11, 2018 – November 16, 2018
          Profit/(Loss) Total: ($10,427.52)

    (d)  Stock: Cronos Group Inc.
          Stock Price: $5.42
          No. of Trades: 11
          Dates of Trades: May 24, 2018 – February 6, 2019
          Profit/(Loss) Total: $10,858.24

    (e)  Stock: eWellness Healthcare Corp.
          Stock Price: $0.0002
          No. of Trades: 24
          Dates of Trades: October 4, 2018 – October 1, 2019
          Profit/(Loss) Total: ($72,089.31)

    (f)  Stock: iShares Silver Trust
          Stock Price: $15.48
          No. of Trades: 3
          Dates of Trades: November 18, 2014 – May 7, 2018
          Profit/(Loss) Total: ($20,644.87)

    (g)  Stock: Kinerjapay Corp.
          Stock Price: $0.0004
          No. of Trades: 17
          Dates of Trades: February 20, 2019 – September 20, 2019
          Profit/(Loss) Total: ($57,640.97)

    (h)  Stock: PetIQ Corp.
          Stock Price: $29.13
          No. of Trades: 31
          Dates of Trades: February 15, 2018 – May 10, 2019
          Profit/(Loss) Total: $71,521.83

40. As a result of Defendant's day-trading Plaintiff's IRA funds, Plaintiff realized total gains of $137,890.41 and suffered total losses of $330,426.52. Even that number $137,890.41 is misleading. Subtracting the $71,521.83 gain earned from the PetIQ investment recommended by Plaintiff himself, it becomes apparent that Defendant actually only produced for Plaintiff a trading gain of $66,368.58 (which was overwhelmingly offset by the $330,426.52 in losses that Defendant produced). Again, this was a retirement account.

41. In total, Plaintiff suffered a net loss of $192,536.11 along with fees of $1,204.50. However, when focusing on the trading losses in the IRA that were strictly based on Defendant's actual trades (*i.e.*, not the positive return received from the PetIQ investment recommended by Plaintiff himself) was $264,057.94 -- a staggering seventy-five percent (75%) of Plaintiff's IRA.

42. In May 2020 -- after suffering the aforementioned losses -- Plaintiff removed Defendant from having authorized access to Plaintiff's IRA.

43. Plaintiff performed all of his duties and obligations; and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

44. To enforce his rights, Plaintiff retained the undersigned counsel and is obligated to pay counsel a reasonable fee for its services.

## COUNT I
## BREACH OF FIDUCIARY DUTY

45. Plaintiff re-alleges, and adopt by reference herein, Paragraphs 1 - 44 above, and further alleges:

46. Pursuant to the representations made by Defendants to Plaintiff, Plaintiff agreed to entrust funds to Defendants and remit periodic investment advisory fees in exchange for Defendants' investment management and advice.

47. Defendants were required to manage the investments in the accounts pursuant to Plaintiff's investment objectives, which Defendants did not do.

48. Plaintiff reposed a special confidence in Defendants, who were his advisers and reasonably inspired confidence that they would act in good faith for Plaintiff's best interests.

49. Defendants, as investment advisers, are fiduciaries under the Investment Advisers Act, with a duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to avoid misleading clients.

50. Defendants had a fiduciary duty to exercise the utmost good faith in dealing with Plaintiff, including, but not limited to the following:

   (a) The duty to manage Plaintiff's assets as dictated by Plaintiff's needs, objectives, and instructions;

   (b) The duty to inform Plaintiff of the risks involved in purchasing or selling a particular security;

   (c) The duty to diversify Plaintiff's assets and avoid overconcentration in limited number of stocks or asset classes;

   (d) The duty to ensure Plaintiff understood the risks of investing in risky securities and strategies and that Plaintiff was willing to take those risks; and

   (e) The duty to act in Plaintiff's best interests.

51. Despite having these fiduciary duties, Defendants took advantage of their position of trust and confidence they developed with Plaintiff by using their discretion to invest Plaintiff's retirement money in risky and unsuitable securities that were inconsistent with Plaintiff's conservative investment objectives.

52. Defendants created and implemented unreasonable, unsuitable, and irresponsible investments in relation to Plaintiff's retirement needs.

53. As a result, Defendants breached their fiduciary duties to Plaintiff.

54. Defendants' breach of fiduciary duty proximately caused Plaintiff economic injury.

55. As a result of the breach of fiduciary duty by the Defendants, Plaintiff suffered damages, and seek, among other things, compensatory damages, well-managed account damages, and interests.

## COUNT II
## NEGLIGENCE/GROSS NEGLIGENCE

56. Plaintiff re-alleges, and adopt by reference herein, Paragraphs 1 - 44 above, and further alleges:

57. Defendants had a duty to Plaintiff to exercise reasonable care and discretion in managing and administering investments in Plaintiff's IRA.

58. Defendants breached their duty to Plaintiff by, for example, causing Plaintiff to lose hundreds of thousands of dollars in his retirement account between late-2014 and mid-2020, in contrast to investment markets rising and appreciating in value over that same period.

59. Defendants' negligence and/or gross negligence included their failure to:

   (a) Provide Plaintiff with appropriate investment advice;

   (b) Make conservative investments by purchasing stocks in blue chip companies like Facebook, Amazon, Apple, Netflix, or Google;

   (c) Provide suitable investment portfolios;

   (d) Refrain from engaging in speculative day trading;

   (e) Advise Plaintiff that investing in penny stocks and weed stocks is risky; and

   (f) Provide investment services and advice in accordance with Defendants' fiduciary duties.

60. As a direct and proximate result of the negligence and/or gross negligence of Defendants, Plaintiff has been damaged.

## DEMAND FOR RELIEF

Based on the foregoing, Plaintiff DAVID "RYAN" MCCAIGUE, an individual, demands judgment in his favor jointly and severally against Defendants DOENCH WEALTH MANAGEMENT, LLC and BRIAN H. DOENCH, as follows:

   (a) Awarding compensatory damages for all damages sustained as a result of the Defendants' wrongdoing as well as pre-judgment interest, where applicable;

(b) Awarding post-judgment interest to run from the date an award is entered in this matter in favor of Plaintiff until the date that the award is fully paid and satisfied by Defendants;

(c) Awarding fees, commissions, and compensation charged to Plaintiff's accounts;

(d) Awarding "well-managed account" damages in an amount to be determined at the hearing;

(e) Awarding punitive damages based on Defendants' reprehensible, egregious, and misrepresentations and/or omissions;

(f) Awarding Plaintiff all reasonable attorneys' fees, expenses, and costs, including experts' fees; and

(g) Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

## RESERVATION OF RIGHTS

Plaintiff DAVID "RYAN" MCCAIGUE reserves his right to further amend this Complaint, upon completion of his investigation and discovery, to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances and as allowed by law.

Dated:   July 1, 2020

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:   (954) 516-6000

By: _____
DAVID SILVER
Florida Bar No. 572764
E-mail: DSilver@SilverMillerLaw.com

*Counsel for Plaintiff David "Ryan" McCaigue*